# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, STATE FARM
MUTUAL AUTOMOBILE
INSURANCE COMPANY

                **Plaintiffs,**

-vs-                                   **Case No.  6:03-cv-1645-Orl-31KRS**

GARY M. WEISS, ROBERT J. BROWN, &
SPECTRUM DX SERVICES, INC.,

                **Defendants.**
_____/

# ORDER

       The Plaintiffs, State Farm Mutual Automobile Insurance Company ("State Farm Mutual")

and State Farm Fire & Casualty Company ("State Farm Fire") (collectively referred to, where

appropriate, as "State Farm"), have sued a number of defendants alleging that they engaged in a

scheme to fraudulently bill State Farm for certain medical tests, thereby committing, *inter alia*,

racketeering violations and fraud.  Pursuant to settlement agreements, certain defendants were

dismissed.[1]  Another defendant, Robert Brown ("Brown") filed for bankruptcy, (*see* Docs. 264,

268), and yet another defendant, Spectrum DX Services, Inc. ("Spectrum"), has not participated in

---

[1] *See* Docs. 198 and 199 (together, dismissing ten defendants).

this action, thus essentially leaving Gary Weiss ("Weiss") as the sole remaining defendant.[2]  Weiss

has moved for summary judgment (Doc. 311), and the Plaintiffs have responded thereto (Doc.

343).  The Court heard argument on the motion on January 6, 2006.

## I.    Background

A. Parties and Players

*1) Parties*

State Farm Mutual and State Farm Fire are Illinois corporations with their principal places

of business in Bloomington, Illinois.  Both are licensed and engaged in the business of insurance

throughout the United States.

Weiss is a citizen of, and has been licensed to practice medicine in, the State of Florida.

He is a board certified neurologist, and operates a private practice in Melbourne, Florida.

*2) Relevant Players*

David Goroway ("Goroway") operated Practice Mechanix, Inc. ("PMI"), through which he

marketed a variety of products and services, including certain diagnostic tests, to chiropractors.[3]

Brad Goldstein ("Goldstein") owned and operated Premier Medical Group, Inc.

("Premier"), which provided chiropractors with the equipment and technicians necessary to

conduct the diagnostic tests.[4]

---

[2] Because certain parts of the discussion requires the mention of some or all of the dismissed defendants, the Court will collectively refer to the originally named defendants (including, but not limited to, David Goroway, Practice Mechanix, Inc., Brad Goldstein, Premier Medical Group, Inc., Robert Brown and Spectrum DX Services, Inc.) and the current Defendant as the "Original Parties."

[3] Goroway and PMI were originally included as defendants in this case, but were dismissed upon an agreed motion to dismiss.  (*See* Docs. 197 and 198).

[4] Premier was originally included as a defendant in this case, but was dismissed after reaching a settlement with the Plaintiffs.  (Doc. 199).

Brown owned and operated Spectrum, a company that provided interpretations of the results of those diagnostic tests.

B. Facts

*1) General*

The facts of this case involve a practice wherein companies would market electrodiagnostic tests and equipment to chiropractors by demonstrating how the tests could be used to benefit their practices through improved care and increased profitability.[5] (*See* Doc. 345, Att. 1, Ex. 1 at 173-76, 209; Att. 3, Ex. 3 at 231-32, 269-70). Technicians working for mobile diagnostic companies would conduct the tests at the chiropractors' offices, and another company would compile diagnostic reports for the test results. The chiropractors would then be able to send bills, generally to insurance companies, for the testing (the "technical component"),[6] and the company that prepared the diagnostic reports (or a related entity) would send bills, also generally to insurance companies, for preparation of the reports (the "professional component"). This was all done with the goal of allowing the chiropractors to increase their profitability, and to allow the various diagnostic testing and interpreting companies to also reap profits.[7] (*See generally* Doc. 345, Att. 1, Ex. 1 at 89; Att. 3, Ex. 3 at 231-32, 269-70).

---

[5] The marketing was done in a variety of ways, including seminars, faxes, direct mail, phone sales and direct sales. (Doc. 345, Att. 3, Ex. 3 at 154-55).

[6] The companies involved in this practice would supply the chiropractors with forms, billing codes and bills to help the chiropractors bill for the technical component of the tests. (Doc. 345, Att. 3, Ex. 3 at 263-68).

[7] The gist of the Plaintiffs' assertions is that these chiropractors were induced to order medically unnecessary tests because of the lucrative financial windfalls the chiropractors could receive from ordering such tests. (*See generally* Doc. 345, Att. 1, Ex. 1 at 223).

*2) Marketing the program and leases with participating chiropractors*

Goroway and PMI marketed, among other things, mobile electrodiagnostic testing to chiropractors.  Goroway gave presentations and seminars to which he would attract attendees by promising them that they could increase their income significantly.  (Doc. 345, Att. 5, Ex. 25 at 3-4).  At these seminars, Goroway would teach chiropractors about these tests and the billing codes to be used, and stressed the financial benefits available from ordering the tests.  (*Id*.).  When chiropractors expressed interest, sales consultants would visit them.  These consultants were directed to tell the chiropractors that they should order these tests for every patient they had.  (*Id*.).

Chiropractors who indicated that they wished to have these tests performed on their patients then entered into leases with Premier, whereby they agreed to pay a small amount, generally between $200 and $500 per month, to lease the technicians and the equipment necessary to perform these tests.[8]  (*Id*. at 4).  Premier then arranged for the test results to be interpreted, and billed thousands of dollars for the interpretations for each patient.  (*Id*.; *see also* Doc. 345, Att. 1, Ex. 1 at 89).  The chiropractors billed separately for the performance of the tests, and were able to do so because Premier provided them with sample billing forms, including the proper codes and charges to be used.  (Doc. 345, Att. 5, Ex. 25 at 4; *see also* Doc. 345, Att. 1, Ex.  at 89).  In this way, the chiropractors were able to collect approximately one thousand dollars per patient tested.[9]  (Doc. 345, Att. 5, Ex. 25 at 4).  Goroway monitored the number of tests each chiropractor ordered,

---

[8] It appears that Premier made little effort to collect these lease payments.  (Doc. 345, Att. 35, Ex. 25 at 4).

[9] In effect, these chiropractors were given incentives to order these tests regardless of whether they were medically necessary.

-4-

and instructed the sales consultants to encourage the chiropractors to order as many tests as possible.  (*Id*. at 5).

### 3) Premier, Spectrum and Weiss

Premier[10] acted as a "mobile diagnostic company."  (Doc. 320, Att. 4, Ex. C at 2).  Premier entered into Lease Agreements with chiropractors whereby the chiropractors leased from Premier neurological technicians trained to perform certain diagnostic tests and the diagnostic testing equipment used in those tests.  Premier would arrange for these technicians to bring the mobile equipment to the chiropractors' offices to perform various tests.[11]  (Doc. 320, Att. 4, Ex. C at 2Doc. 345, Att. 34, Ex. 24).  The Lease Agreement noted that it was not cost-effective for the healthcare provider to purchase such equipment or to employ such technicians on a full-time basis, and instead allowed the healthcare provider to lease such equipment and personnel from Premier at a low cost of, for example, a total of $2,400 per year.  (*Id*. at pages 1-2).

---

[10] Premier, which was owned by Goldstein, owned a company called B&G Diagnostics ("B&G").  (Doc. 345, Att. 3, Ex. 3 at 88; Att. 9, Ex. 7 at 248).

[11] These tests included nerve conduction velocity tests ("NCV's"), dermatomal evoked potential tests ("DEP's"), somatosensory evoked potentials ("SSEP's") and spinal ultrasounds, and are sometimes collectively referred to in the leases as "EDX Procedures."  (Doc. 320, Att. 4, Ex. C at 2; Doc. 345, Att. 34, Ex. 24 at 4).  SSEPs, DEPs and NCVs are non-invasive electrodiagnostic tests in which peripheral nerves in the arms or legs are stimulated with electrical currents.  (Doc. 110 at 6).  The velocity, amplitude and shape of the response is then recorded by electrodes attached to the skin. (*Id*.).  A spinal ultrasound involves the use of ultrasound technology to obtain images of spinal and paraspinal muscles.  (*Id*.).  There is a dispute as to whether spinal ultrasounds are valid diagnostic tools for the purposes for which they were used and marketed in this case.  Whereas Weiss wrote an article concluding that spinal ultrasounds are valid diagnostic tools, (Doc. 345, Att. 3, Ex. 3 at 301), there are a number of other studies indicating the exact opposite.  (Doc. 345, Att. 3, Ex. 3 at 304-309; Att. 9, Ex. 7 at 220-28).

During 1996, Brown started Spectrum, the purpose of which was to prepare reports containing interpretations of diagnostic tests ordered by treating physicians.  In return for a fee, Spectrum provided mobile diagnostic companies, such as Premier,[12] with interpretive reports that purported to reflect a "reading physician's" interpretation of various data, forms and films generated by the diagnostic tests.[13]  (Doc. 320, Att. 4, Ex. C at 2).  The mobile diagnostic companies would then submit those interpretive reports to insurance companies along with a bill for the interpretation services.[14]  (*Id*. at 2-3).  Thus, after an interpreting physician provided a report, the mobile diagnostic company would bill the insurance company, and then pay Spectrum for the interpretation, and Spectrum, in turn, would pay the interpreting (or reading) physician.  (Doc. 320, Att. 10, Ex. I at 30-31).

Premier was one of Brown's primary mobile diagnostic clients.  (Doc. 320, Att. 4, Ex. C at 2).  Spectrum received approximately 150 to 200 packages of diagnostic tests per day, at least three quarters of which came from Premier.  (*Id*. at 4).

---

[12] Brown's relationship with Premier began in 1995, when Brown was operating Prism Diagnostic Laboratories, Inc. ("Prism"), of which he was the president from August of 1994 through June of 1996.  (Doc. 345, Att. 40, Ex. 30 at 4).  Thereafter, the relationship continued, with Spectrum replacing Prism.  (*Id*.).

[13] Spectrum promised its clients that it could provide these interpretive reports within twenty-four hours of receiving the results of the diagnostic tests.  (Doc. 320, Att. 4, Ex. C at 8).  Goldstein was adamant about receiving the reports within that time, causing great pressure on Spectrum to perform.  (*Id*. at 8-9).

[14] Payment for these services could be claimed either "globally" or in two separate billing components.  (Doc. 320, Att. 14, Ex. M at 37).  The "technical component" was comprised of the actual diagnostic testing, while the "professional component" consisted of the interpretation of the results of that testing.  (Id.).

Brown asked Weiss to act as an "interpreting physician" for Spectrum, and Weiss agreed.[15] (*Id.*).  Brown and Weiss agreed that Weiss would receive $25 for each interpretive diagnostic test he reviewed.[16]  (Doc. 345, Att. 9, Ex. 7 at 245-46).[17]  Weiss does not know how much Spectrum charged its clients for the reviews that Weiss performed.  (Doc. 320, Att. 13, Ex. L at 312).  Weiss' involvement with Spectrum was limited to reviewing these interpretations; he neither owned nor controlled any part of Spectrum, did not participate in either Spectrum's management or operations, and only received compensation from Spectrum based on the review services he performed.[18]  (*See* Doc. 236 at 6-7).

On June 13, 2000, Weiss entered into an agreement with B&G whereby Weiss was to be employed as an interpreting physician and paid $2,500 per month to receive phone calls from those doctors whose tests Weiss had interpreted.[19]  (Doc. 345, Att. 9, Ex. 7 at 330-33; Att. 44, Ex. 33).

---

[15] Weiss was the only medical doctor performing these interpretations for Spectrum.  (Doc. 320, Att. 5, Ex. D at 98).

[16] There is some dispute about the amount Weiss was paid.  While Weiss asserts that he was to be paid $25 per "read," for both ultrasounds and other tests, Brown states that Weiss only received $2.50 for ultrasounds and $4 for the other tests.  (Doc. 345, Att. 10, Ex. 8 at 743-44).  Brown also asserts that Weiss never received a percentage of the amount Spectrum was compensated by its clients.  (*Id.*).  Goldstein states that Weiss was supposed to receive approximately half of what Premier paid to Spectrum, and that it would be "ludicrous" if Weiss was only being paid $2.50 or $3 per interpretation.  (Doc. 345, Att. 3, Ex. 3 at 115-16).

[17] In 1999, Spectrum paid Weiss $78,972; in 2000, $39,869; in 2001, $131,279 (for both interpretations and his role as medical director); and in 2002, $42,543.  (Doc. 320, Att. 13, Ex. L at 309-311).

[18] In 2001, Spectrum began paying Weiss as its medical director, as well, although Weiss had been acting as medical director prior to that time without being paid as an employee of Spectrum.  (Doc. 345, Att. 10, Ex. 8 at 742; 515-16).

[19] Goldstein asserts that this written agreement simply memorialized an agreement they had since 1996.  (Doc. 345, Att. 3, Ex. 3 at 31-32).

B&G was also authorized to use Weiss' name on certain forms to identify him as the reading physician, and to sign Weiss' name on those forms.  (*Id.*; *see also* Doc. 320, Att. 7, Ex. F at 50, 55).[20]  That agreement also stated that Weiss was neither a director nor an officer of B&G, was not a medical director, was not responsible for overseeing the medical diagnostic testing that B&G performed, had no responsibility for sales or marketing, and had no knowledge of B&G's inner workings.  (Doc. 345, Att. 44, Ex. 33; *see also* Doc. 320, Att. 7, Ex. E at 700-702).

In November of 2001, Weiss signed a contract to work for Premier to develop a quality assurance program, to oversee quality control and to serve as Premier's medical director.[21]  (Doc. 345, Att. 55, Ex. 43).   That contract permitted Premier to use Weiss' name on all documents which required the identification of a medical director for legal and billing purposes.  (*Id.* at 2).  Weiss did not have the authority to hire or fire employees at Premier and did not exercise operational control, but instead simply performed the role of a medical doctor.  (Doc. 320, Att. 7, Ex. F at 739-41).  His activities were limited to providing interpretive reports and making himself available to receive phone calls from physicians.  (*Id.* at 741).

*4) Interpretation of the diagnostic tests*

Data from diagnostic tests was provided to Spectrum by its customers.  (*See generally* Doc. 236 at 7).  Spectrum's employees assembled the test data and drafted a report of the test results,[22]

---

[20] Goldstein asserts that Weiss was aware that B&G used Weiss' signature because on various occasions insurance companies sent checks for B&G's services to Weiss by mistake, and Weiss would then issue checks to B&G.  (Doc. 320, Att. 7, Ex. E at 68).

[21] Under this contract, Weiss was to receive a salary of $90,000 per year.  (Doc. 345, Att. 55, Ex. 43 at 2-3).

[22] Spectrum employees performed "pre-reads" by comparing numerical data from the diagnostic tests with a chart (supplied by Weiss) reflecting the normal numeric ranges.  (Doc. 320, Att.

which report was then sent to interpreting physicians for their review and approval.  (*Id*.).  This package of material, particularly the interpretive report, is known as a "pre-read."  Thus, Spectrum delivered test results and the accompanying draft reports to Weiss on a daily basis, and would pick up other tests and draft reports that Weiss had reviewed.  (*Id*.).  The number of diagnostic tests Spectrum submitted for Weiss' review varied daily, ranging from as few as twenty to as many as one hundred per day.  (Doc. 345, Att. 11, Ex. 9 at 194).

It is unclear what information Spectrum sent to Weiss.  Weiss would receive "pre-read packets," which were supposed to include medical necessity forms, ultrasound films, numerical data and wave forms, as well as the reports prepared by Spectrum employees.  (Doc. 345, Att. 10, Ex. 8 at 273-74; Att. 11, Ex. 9 at 191, 264).  However, at times, Weiss was not provided with materials such as the wave forms that accompany electrodiagnostic testing, and thus Weiss would produce interpretive reports without reviewing the wave forms.  (*Id*. at 275-76, 613; *see also* Doc. 345, Att. 9, Ex. 7 at 250-51).[23]  Weiss would review the material that Spectrum provided, make necessary notes or changes on the preliminary report (originally produced by Spectrum employees) and then send all of the material back to Spectrum.  (*Id*. at 283-84).  Sometimes, Weiss would simply write his initials on the preliminary report without making changes, thereby indicating his

---

4, Ex. C at 4).  If the numerical data fell within the range indicated on the worksheet, Spectrum employees concluded that the test results were normal.  (*Id*.).  They would also perform pre-reads on spinal ultrasounds by reviewing films and attempting to identify areas of inflammation.  (*Id*.).  None of these employees were physicians.  (Doc. 320, Att. 4, Ex. C at 3).

[23] Brown states that when the topic arose with Weiss, Weiss simply stated that if wave forms were available to send them to him, but that if they were not available, that he could still "work with what [he was] given."  (Doc. 345, Att. 10, Ex. 8 at 614).

agreement with the preliminary report.[24]  (*Id*. at 290-91).  Spectrum would then enter the

preliminary report, including Weiss' notes, into a computer, and then shred the original report.

(*Id*.).  Spectrum then produced a final narrative report, which would include Weiss' signature.

(Doc. 345, Att. 9, Ex. 7 at 175)  Weiss did not, however, usually see these final reports.  (*Id*.).

There is some dispute about whether Weiss actually performed interpretations of the

diagnostic tests.  On a daily basis, Spectrum received between 150 to 200 packages of diagnostic

test materials from mobile diagnostic companies, and Spectrum employees would review the test

results and perform a "pre-read" or an interpretation of those results.  (*Id*. at 3, 4).  Spectrum

employees would then input data into a computer system and create the interpretive reports, print

those reports, apply Weiss' signature to those reports using either a signature stamp or an

electronic signature, and then send those interpretive reports to mobile diagnostic companies

(including Premier).  (*Id*. at 5).  Between February and September of 2000, Weiss allegedly

received no documents from Spectrum from which he could have rendered an interpretation.[25]

(*Id*.; *see also* Att. 6, Ex. E at 37-39; Doc. 320, Att. 11, Ex. J at 135).

After September of 2000, Spectrum modified the protocol relating to interpretations.  (Doc.

320, Att. 4, Ex. C at 6).  Spectrum began sending Weiss a sampling (between ten and fifteen

percent) of all of the pre-reads that Spectrum performed.  (*Id*.; *see also* Att. 6, Ex. E at 44-45).

Spectrum attached the films relating to the ultrasounds, but only about ten percent of the wave

forms relating to the pre-reads were sent to Weiss.  (Doc. 320, Att. 4, Ex. C at 6). During that time,

---

[24] This occurred "pretty often" according to Brown.  (Doc. 345, Att. 10, Ex. 8 at 290).

[25] However, it appears that Weiss was still receiving payment for the interpretive reports during this time.  (Doc. 320, Att. 4, Ex. C at 5; Att. 11, Ex. J at 163).

-10-

Weiss did not return any of the sample pre-reads with changes or comments.  (*Id*.).  Spectrum

would thus simply "shoot" the reports through the computer.  (Doc. 320, Att. 6, Ex. E at 44-45).

In January of 2002, the protocol changed again, and Weiss began receiving the pre-reads

for all of the tests.  (Doc. 320, Att. 4, Ex. C at 6).  He continued to receive the film for all

ultrasounds, but only received wave forms approximately ten percent of the time.  (*Id*.).  It appears

questionable whether Weiss reviewed these pre-reads, however, for several reasons.  First, it

appears that Weiss did not make changes to or comment on the pre-reads during this period.  (*Id*.

at 6-7).  Second, Weiss often returned large numbers of pre-reads, sometimes as many as 150 or

200, within one or two hours of receiving them.  (*Id*. at 7; *see also* Doc. 320, Att. 11, Ex. J at 228).

Third, when Weiss did not return the pre-reads within a short time, Spectrum simply sent out

interpretive reports (using Weiss' signature) to mobile diagnostic companies without receiving

Weiss' comments.  (Doc. 320, Att. 4, Ex. C at 7).

Weiss acknowledges that he has no way of knowing if Spectrum sent him results for all of

the tests or whether they only sent him "one out of [ten]."  (Doc. 345, Att. 9, Ex. 7 at 304).[26]

*5) The end of the relationships*

In March of 2002, Weiss received a notice from the American Association of

Electrodiagnostic Medicine, advising recipients that some diagnostic service companies were

demonstrating quality control problems and potentially fraudulent billings.  (Doc. 320, Att. 13, Ex.

L at 241-42; Doc. 345, Att. 14, Ex. 12).  Weiss contacted Brown, who advised him that perhaps

six diagnostic reports had been sent out without having been read and approved by Weiss.  (Doc.

---

[26] Weiss maintained virtually no records of his relationship with Spectrum and Premier.

320, Att. 13, Ex. L at 241-42).  Weiss then resigned his position at Premier, (Doc. 345, Att. 53, Ex. 41), and advised Spectrum that he would no longer perform interpretation services for them.  (*Id.* at Att. 52, Ex. 40; *see also* Doc. 320, Att. 13, Ex. L at 241-42).

Weiss asserts that while he expected that his name would appear on the interpretive reports as the reading doctor, he did not authorize anyone to use his signature stamp to sign his name to the interpretive reports.  (Doc. 320, Att. 13, Ex. L at 264-66).  He states that he subsequently discovered that such reports were, however, sent out with his signature stamped on them.  (*Id.* at 266).  Weiss also asserts that he did not authorize anyone to use his name or his signature on bills for the services he provided, but that he has discovered that this was done, as well.  (*Id.* at 268-70).

Other evidence, however, suggests that Weiss provided the signature stamps to Spectrum, (*see* Doc. 320, Att. 6, Ex. E at 68; Doc. 320, Att. 11, Ex. J at 207), and that Weiss was aware that both Spectrum and Premier were using his name and his signature on various forms, reports and bills.  (*See* Doc. 345, Att. 3, Ex. 3 at 27-28, 55-56, 58-59, 95-97).  Indeed, Weiss has admitted that Spectrum had a signature stamp to use to put his signature on the reports.  (Doc. 345, Att. 47, Ex. 35 at 15).  Further, Goldstein stated that Premier paid Weiss $72,500 between 2000 and 2002, and the only service Weiss performed for that compensation was to permit Premier to use his signature on their bills.  (*Id.* at 111-12).

C. Claims and Arguments

The Plaintiffs assert that Weiss was part of a fraudulent scheme to use ineffective diagnostic tests to cause thousands of dollars to be charged to the Plaintiffs for the performance

and interpretation of those tests.  (Doc. 110 at 6).  The tests[27] were purportedly used to confirm or

exclude the existence of nerve root radiculopathies,[28] and to isolate the nature and location of

neurologic dysfunction and/or inflammation.  (*Id*.).   The Plaintiffs assert, however, that it is

established medical science, and that the Original Parties were all aware, that these tests, alone or

in combination, could not accomplish either purpose, and that the Original Parties only used these

tests as a means of producing profits.  (Doc. 110 at 6).

         The Original Parties allegedly caused the tests to be performed on the majority of patients

for whom they submitted bills to the Plaintiffs.  (Doc. 110 at 6-7).  Further, to increase

profitability, the Original Parties allegedly caused spinal ultrasounds to be performed on multiple

regions of a patient's spine, and then submitted separate charges for the tests performed on each

region.  (*Id*.).  In addition, the Original Parties allegedly sought to increase profitability by causing

NCVs and either SSEPs or DEPs to be performed on each of the three peripheral nerves in both of

a patient's arms and/or each of the three peripheral nerves in both of a patient's legs.  (*Id*. at 7).

Finally, the Original Parties would allegedly cause additional NCV tests, called "H-Reflex" and

"F-Wave" tests, to be performed on many patients, which also increased the charges submitted to

the Plaintiffs.  (*Id*. at 7-8).  The Original Parties did not, however, except in limited circumstances,

---

   [27] *See* n.11, *supra*.

   [28] A radiculopathy is one of the anatomic and physiological deviations from normal that
constitute disease or characterize a particular disease in the nerve roots.  Medline Plus, U.S. National
Library of Medicine, *available at* http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last
modified February 4, 2003).

conduct needle electromyography studies ("EMG"),[29] the electrodiagnostic test that is necessary to confirm or exclude the existence of nerve root radiculopathies and to isolate the nature and location of neurological dysfunction.

The Plaintiffs further allege that Weiss would interpret the results of the tests and set out his findings in reports which certain of the Original Parties would then submit to the Plaintiffs to support charges for the tests.[30]  (Doc. 110 at 9).

The Plaintiffs also allege that a conspiracy existed involving Premier, Spectrum and Weiss, whereby, working in concert, they caused the tests to be marketed to doctors, which led to the production and interpretations of reports, all of which resulted in bills being sent to the Plaintiffs for the recovery of the costs of the technical and professional components.  (Doc. 345, Att. 1, Ex. 1 at 221-23).  The Plaintiffs also assert that Weiss was aware that he was the only medical doctor performing interpretations, that the tests in question had no diagnostic value, that he asserted that the tests were clinically mandatory, and that he was aware that reports and bills were being sent out based on his interpretations.  (Doc. 320, Att. 10, Ex. I at 64-66).  The Plaintiffs allege that Weiss engaged in fraud when he stated or represented that the tests were medically necessary and clinically mandatory, that they had diagnostic value, and that they could exclude radiculopathy. (*Id*. at 98-100).

---

[29] An EMG involves the insertion of a needled into various muscles to measure electrical activity in each, and generally must be performed by a medical doctor.  (Doc. 110 at 8).

[30] The Plaintiffs allege that Weiss was not licensed to practice medicine in many of the states in which he purported to interpret the Four Tests.  (Doc. 110 at 9).

The Plaintiffs have thus asserted claims against Weiss for racketeering and racketeering conspiracy (Counts II and III, respectively) under 18 U.S.C. sections 1962(c), 1962(d) and 1964, and for common law fraud under Florida law (Count IV).

Weiss argues that he is entitled to summary judgment for a number of reasons.  First, he asserts that he is entitled to summary judgment on the substantive racketeering claim because his professional activities as a medical doctor do not satisfy the "operation and management" element of 18 U.S.C. section 1962(c), and that his provision of professional services to an alleged racketeering enterprise does not reflect an agreement to conduct or participate in the enterprise's affairs.  Second, he argues that a claim for civil conspiracy to commit racketeering violations cannot stand absent underlying substantive racketeering liability.[31]  Third, he argues that he cannot be liable for common law fraud because the Plaintiffs did not rely on any alleged misrepresentation by Weiss, and because the Plaintiffs cannot show that he made materially false statements to them with the intent of inducing their reliance thereon.[32]  In addition, as to the fraud claim, Weiss argues that he cannot be liable for the actions of Spectrum and Premier simply because they employed him as medical director.

## II.     Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d

---

[31] Weiss also argues that the Plaintiffs cannot establish liability for conspiracy based on an aider and abetter theory.  The Plaintiffs, however, have stated that they are not pursuing such a theory of liability.  (Doc. 343 at 24).

[32] Weiss also argues that he cannot be liable for conspiracy to commit fraud.  The Plaintiffs however, have stated that they are not pursuing such a theory of liability.  (Doc. 343 at 24, 40 n.10).

454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to

the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the

burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929

F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347,

1352 (M.D. Fla. 2003).

When a party moving for summary judgement points out an absence of evidence on a

dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving

party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and

citation omitted). Thereafter, summary judgment is mandated against the non-moving party who

fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25;

*Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely

on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors

Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting

facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th

Cir. 1976).[33]

The Court must consider all inferences drawn from the underlying facts in a light most

favorable to the party opposing the motion, and resolve all reasonable doubts against the moving

party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the

---

[33] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

### III. Legal Analysis

A. Count I - Racketeering Under 18 U.S.C. §§ 1962(c) and 1964[34]

Title 18 U.S.C. section 1962(c) ("Section 1962(c)") provides, in relevant part, that

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

18 U.S.C. § 1962(c). Thus, to prove a RICO claim, a plaintiff must show: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a pattern (4) of racketeering activity (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an enterprise (7) the activities of which affect interstate or foreign commerce." *McCulloch v. PNC Bank, Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002); *see also In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1273 (S.D. Fla. 2003).[35]

---

[34] 18 U.S.C. § 1964 provides civil remedies for those injured by violations of 18 U.S.C. § 1962.

[35] A plaintiff relying on violations of wire or mail fraud statutes as predicate acts for civil racketeering claim (as the Plaintiffs here do) must show not only that those statutes were violated, but that he suffered injury as a result of those violations, or, in other words, that he suffered an injury that was proximately caused by those violations. *Pelletier v. Zweifel*, 921 F.2d 1465, 1499 (11th Cir. 1991). Further, a plaintiff bringing a civil RICO case predicated upon mail or wire fraud "must prove that he was a target of the scheme to defraud and that he relied to his detriment on misrepresentations made in furtherance of that scheme." *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1360 (11th Cir. 2002).

Weiss challenges the "participation" element, arguing that his acts as a medical professional do not constitute the conduct of, or participation in, the racketeering activities of the entities involved.  The parties also dispute the standard to be applied in this case for determining the acts necessary to meet the elements of Section 1962(c), and dispute the applicability of the standard set forth by the Supreme Court in *Reves v. Ernst & Young*, 507 U.S. 170 (1993).

In *Reves*, the Supreme Court addressed the meaning of the phrase in Section 1962(c) which contains the language "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs."  *Reves*, 507 U.S. at 177.  The Supreme Court determined that the word "conduct" "requires an element of direction," and that "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs."  *Id*. at 179.  Thus, the Supreme Court concluded that the relevant language requires that a person "must participate in the operation or management of the enterprise itself."  *Id*. at 185.  The Supreme Court noted that an "enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management," *id*. at 179, and determined that

> the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required.

*Id*. at 184 (emphasis in original).

Subsequent cases have noted that "*Reves* is a case about the liability of *outsiders* who may assist the enterprise's affairs."  *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d

967, 978 (7th Cir. 1995) (emphasis in original).[36]   The court in *MCM* noted that while in *Reves* the

Supreme Court held that an outside defendant must play some role in directing the enterprise's

affairs in order to be liable under Section 1962(c), that requirement is distinguished from liability

for "lower rung participants who acted under the direction of the enterprise's upper management."

*Id*. at 979.   Thus, where a defendant, who was alleged to be part of the enterprise itself (an

"insider"), undertook certain predicate acts at the direction of the enterprise's managers, and was

vital to the achievement of the enterprise's primary goal, *Reves* would not bar a recovery against

such a defendant.   *Id*.   Accordingly, a lower rung inside participant may be liable under Section

1962(c) "for merely 'enabling the enterprise to meet its goals.'"   *State Farm Mut. Auto. Ins. Co. v.*

*Abrams*, 2000 WL 574466 at *9 (N.D. Ill. May 11, 2000); *see also Chen v. Mayflower Transit,*

*Inc.*, 315 F. Supp. 2d 886, 908 (N.D. Ill. 2004) (where defendant's role in enterprise went beyond

merely giving directions or performing helpful tasks, and without defendant's involvement,

enterprise would fail to exist, defendant participated in enterprise and took part in directing its

affairs, and was not a complete outsider that would be excluded by *Reves*).[37]

---

[36] Other cases also note that *Reves* applies because the defendant was a party outside the alleged enterprise and there were no allegations that the defendant was employed by or was otherwise an insider.   *See Liberty Mut. Ins. Co. v. Diamante*, 138 F. Supp. 2d 47, 56 (D. Mass. 2001). Furthermore, care is "required in translating *Reves*' concern with 'horizontal' connections -- focusing on the liability of an outside adviser -- into the 'vertical' question of how far RICO liability may extend within the enterprise but down the organizational ladder." *Diamante*, 138 F. Supp. 2d at 56-57.

[37] It is important to note that a physician "is not exempt from RICO liability . . . simply by virtue of the . . . physician's professional status. [I]f a doctor . . . provides services that go to the heart of the allegedly fraudulent scheme, the professional may be liable for providing some direction in the affairs of the enterprise." *State Farm Mut. Auto. Ins. Co. v. Abrams*, 2000 WL 574466 at *11 (N.D. Ill. May 11, 2000); *see also AIU Ins. Co. v. Olmecs Med. Supply, Inc.*, 2004 WL 3270060 at *9 (E.D.N.Y. Feb. 22, 2004) (*Reves* test could be satisfied where physician was alleged to be a key participant, made critical misrepresentations, created false documents and served of point of contact for enterprise).

In this case, regardless of the standard applied -- *Reves*' "outsider" operation and management test or the "insider" standard -- there are material issues of fact that preclude summary judgment on the issue of Weiss' liability under Section 1962(c).  There is evidence suggesting that Weiss had some participation in directing the enterprise, in that: (1) he told them to switch from performing SEP tests to DEP tests, (Doc. 345, Att. 3, Ex. 3 at 487); (2) Goldstein learned about spinal ultrasounds from Weiss, and might not have performed them otherwise, (*id*. at 737); (3) Weiss directed Brown as to what information and data to look for in preparing the pre-read reports, (Doc. 345, Att. 10, Ex. 8 at 281, 627-28); (4) Weiss provided standardized language for the reports, insisted on being involved in creating that language, and had input into any changes made to that language, (*id*. at 655, 665-68; *see also* Doc. 345, Att. 3, Ex. 3 at 71-73); and (5) was the medical director for both Premier and Spectrum, (Doc. 320, Att. 13, Ex. L at 239; Att. 10, Ex. I at 153-54, 155-56).

Further, there is evidence that Weiss performed a number of tasks that enabled the enterprise to meet its goals, in that he: (1) provided worksheets of numerical values for Spectrum employees to use in performing the pre-reads, (Doc. 320, Att. 4, Ex. C at 4); (2) initialed the pre-read reports to indicate his agreement, regardless of whether he reviewed them, (*id*. at 6-7); and (3) provided his signature stamp, knowing that his name was being used, (Doc. 320, Att. 7, Ex. F at 68; Doc. 345, Att. 3, Ex. 3 at 62-63).  The interpretation reports containing his signature put Premier in a position to bill for the interpretation, after which Premier paid Spectrum, who then paid Weiss.  (Doc. 320, Att. 10, Ex. I, 153-54, 155-56).

Finally, there is evidence that Weiss was not only directly involved in this enterprise, but that he was essential to its existence: (1) he was the only medical doctor performing interpretations

for Spectrum during the relevant time period, (Doc. 320, Att. 5, Ex. D at 98); (2) Goldstein's companies could not perform their services, namely the billing, without Weiss' name on the insurance billing forms, because Weiss was the doctor performing the interpretations, (Doc. 320, Att. 7, Ex. F at 49; Doc. 320, Att. 10, Ex. I at 153-54, 155-56); and (3) without Weiss' involvement as a medical doctor, the scheme would not have succeeded.  (Doc. 320, Att. 10, Ex. I at 153-54, 155-56).

Because there is evidence that Weiss was aware of what was occurring, and that he both participated in and took part in the direction of the enterprise, there remain material issues of fact to be decided, and thus summary judgment on the civil racketeering claim in Count I is not appropriate.[38]

B. Common Law Fraud

Under Florida law, the essential elements of a fraud claim are: "(1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation."  *Wadlington v. Continental Med. Servs., Inc.*, 907 So. 2d 631, 632 (Fla. 4th DCA 2005); *Amazon v. Davidson*, 390 So. 2d 383, 385 (Fla. 5th DCA 1980); *Stowell v. Ted S. Finkel Inv. Servs., Inc.*, 641 F.2d 323, 325 (5th Cir. 1981) ("essential elements . . . are: (1) a false statement of fact, (2) known by the defendant to be false at the time it was made, and (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4)

---

[38] Weiss challenges the conspiracy claim under 18 U.S.C. § 1962(d) in Count II on the ground that without underlying substantive violations there can be no liability for civil conspiracy.  Since the Court finds disputed issues of fact regarding the substantive racketeering liability, the Court need not address the conspiracy count at this time.

action by the plaintiff in reliance on the correctness of the representations; and (5) resulting

damage to the plaintiff. ").   Generally, the issue of fraud is not properly the subject of summary

judgment, because a resolution of the issues involved requires an exploration of the relevant facts

and circumstances, and thus a court can seldom determine the presence of fraud absent a trial or

evidentiary hearing.  *Robinson v. Kalmanson*, 882 So. 2d 1086, 1088 (Fla. 5th DCA 2004);

*Amazon*, 390 So. 2d at 385.  This is because the questions of actual misrepresentation, intent,

knowledge and reliance all turn on factual determinations, which are often based on circumstantial

evidence.  *See Cohen v. Kravit Estate Buyers, Inc.*, 843 So.2d 989, 991 (Fla. 4th DCA 2003)

(issues, including intent, frequently require circumstantial evidence of intent and knowledge); *Thor*

*Bear, Inc. v. Crocker Mizner Park, Inc.*, 648 So. 2d 168, 173 (Fla. 4th DCA 1994) (reliance);

*Patterson v. Cincinnati Ins. Co.*, 564 So. 2d 1149, 1151 (Fla. 1st DCA 1990) (misrepresentation);

*Pinzl v. LaPointe*, 426 So. 2d 65, 66 (Fla. 5th DCA 1983) (reliance).

     Weiss asserts that the Plaintiffs cannot show that he made materially false statements to

them with the intent of inducing their reliance thereon, and that even if he did, the Plaintiffs did

not rely on any such alleged misrepresentations.  However, there is evidence that: (1) the

diagnostic tests in question had no diagnostic value, (Doc. 320, Att. 13, Ex. L at 222-24; Doc. 345,

Att. 3, Ex. 3 at 304-309; Doc. 345, Att. 26, Ex. 19; Doc. 345, Att. 28, Ex. 20; Doc. 345, Att. 29,

Ex. 21; Doc. 345, Att. 30, Ex. 22); (2) Weiss was aware that these tests had no diagnostic value,

(Doc. 320, Att. 10, Ex. I at 64-65); (3) Weiss knew that because he was the interpreting physician,

reports would be generated reflecting his interpretation, (Doc. 320, Att. 10, Ex. I at 73, 129-30);

(4) Weiss was aware that reports and bills were sent out with his signature and/or name on them,

(Doc. 320, Att. 4, Ex. C at 5; Att. 10, Ex. I at 64-65; Doc. 345, Att. 3, Ex. 3 at 27-28); (5)

notwithstanding that the tests had no diagnostic value, the reports and bills contained statements that the tests were medically necessary, clinically mandatory and could exclude radiculopathy, (Doc. 320, Att. 10, Ex. I at 64-65, 98-99); and (6) the Plaintiffs relied on the reports and bills because they included Weiss' name, (Doc. 320, Att. 10, Ex. I at 125-26).  Therefore there are disputes over the factual issues relating to the elements of a fraud claim, and thus summary judgment is not appropriate.

**IV.**     **Conclusion**

For the reasons stated herein, the Court finds that there are disputes over material issues of fact, and thus summary judgment on the Plaintiffs' claims is inappropriate.  Accordingly, it is

**ORDERED THAT** Weiss' Motion for Summary Judgment (Doc. 311) is DENIED.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on January 12, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

-23-